# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **SHEILA R. BATES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:11cv1946 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (the Commissioner), denying the application of Sheila R. Bates for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433.[1]  Ms. Bates has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB in September 2009, alleging a disability as of May 25, 2009, caused by systemic lupus, nerve damage in her feet, fibromyalgia, and a leaking heart valve.  (R.[2] at 103-09.)  Her application was denied initially and after a hearing held in July 2010 before Administrative Law Judge (ALJ) Randolph E. Schum.  (Id. at 6-16, 20-49.)

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 2-4.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Delores E. Gonzalez, M.Ed., testified at the administrative hearing.

Plaintiff testified that she was then forty-six years old.  (Id. at 22.)  She is 5 feet 6.5 inches tall and weighs 243 pounds.  (Id. at 27.)  She has a college degree in organizational leadership.  (Id. at 22.)  She attained this degree in December 2008 after attending night-school for approximately six years.  (Id. at 23.)

For approximately twenty-six years, she worked for a corporation that operated McDonald's restaurants.  (Id. at 23.)  By 1996, she was the Director of Operations.  (Id. at 24.)  This required that she be in charge of three restaurants, including the management and maintenance staff, training and development, compiling profit and loss statements, and working directly with the owner/operators.  (Id. at 23.)

She had also been in charge of the Joplin House for the State of Missouri, doing the inventory, compiling profit and loss statements, and computer training the interns who assisted with tours of the house and with the restaurant.  (Id. at 24.)  When she worked for Provident Incorporated, she trained different administrative assistants on inputting various codes into the system and arranging assessments for mentally health patients.  (Id.)  In this position, she had supervised approximately ten counselors.  (Id. at 25.)

- 2 -

When working for Best Buy, she tuned guitars, demonstrated the electric piano, and sold microphones.  (Id.)  She left this job on May 25, 2009, because her feet problems were so severe that she could not walk.  (Id.)  And, she had had a tumor removed from her right ankle.  (Id.)

A few months after she left Best Buy, she applied for unemployment.  (Id.)  She received unemployment in 2009.  (Id.)  It stopped for five months and was resumed three weeks before the hearing because she had no money and was trying to keep her house and buy her medication.  (Id.)  She had applied for unemployment over the telephone.  (Id. at 26.)  She represented that she was "ready, willing, and able to go to work[.]"  (Id.)  Although she had been looking for work, she was not physically able to work.  (Id.)

After her recent echocardiogram (ECG), she was placed on two additional medications.  (Id.)  Her primary care physician is Dr. Shuman.  (Id. at 28.)  She is treating Plaintiff for systemic lupus and fibromyalgia.  (Id.)  The fibromyalgia makes Plaintiff's entire body, including her muscles and joints, hurt and causes migraines and "overwhelming" fatigue.  (Id.)  She wears orthotics in both shoes.  (Id. at 28-29.)  Her feet swell everyday.  (Id. at 29.)  She has been told by her doctor to keep them elevated above her heart whenever she sits.  (Id.)  She "can barely walk," and takes at least twenty minutes to get out of bed in the morning.  (Id.)  A podiatrist has diagnosed her with tarsal and plantar fasciitis in both feet.  (Id. at 31.)  She has had five or six injections, but they did not help other than to make her feet temporarily numb.  (Id.)  The podiatrist was reluctant to do any surgery on her feet due to the lupus.  (Id.)  Also, if she had surgery on both her feet at

- 3 -

the same time, she would not be able to take care of herself – she lives alone – or her home. (Id. at 32.)

Plaintiff has headaches and takes medication for migraines.  (Id. at 29.)  She first described them as occurring "[j]ust about everyday" and then described them as constant. (Id.)  She takes medicine for her high blood pressure.  (Id. at 29.)  She has a hiatal hernia and gastroesophageal reflux disease (GERD).  (Id. at 30.)  She has a cough due to bronchitis and chronic obstructive pulmonary disease (COPD).  (Id. at 31.)

The longest distance Plaintiff can walk is less than a city block due to the excruciating pain in her feet and knees.  (Id.)  The longest she can stand is seven minutes. (Id. at 32.)  The longest she can sit is twenty to twenty-five minutes.  (Id.)  She has to buy only a half gallon of milk at a time because its weight of approximately four pounds is the heaviest she can lift.  (Id. at 33.)

For more than fifty percent of her waking hours, she has her feet elevated on an ottoman.  (Id. at 34.)  It takes her almost three hours to bathe and get dressed.  (Id.)  She has to use a seat in the shower.  (Id.)  And, after taking a shower, she has to sit or lie down.  (Id. at 34-35.)  She has two pairs of shoes that were custom made for her.  (Id. at 35.)  She used to be a fast typist, but is no longer.  (Id. at 36.)  She does not go out to visit family or friends; instead, family comes to see her.  (Id.)  Now, she only goes to church when her sister picks her up.  (Id.)  She used to be an avid tennis player and golfer, but now has to avoid being in the sun.  (Id. at 36-37.)

On a typical day, Plaintiff gets up around 5 o'clock in the morning, takes her medicine, lets her dog out the back door, pays a bill if she has the money, and rests. (Id. at 37.) She passes the time by reading and praying. (Id.) Sometimes, she talks with her parents or with friends that come to visit. (Id.) Her friends shop for her. (Id. at 37-38.) She never goes out by herself. (Id. at 38.) Her family comes over and cleans her house two or three times a week. (Id.) She goes to bed around 10 o'clock at night and goes to sleep around 2 o'clock in the morning. (Id.) The need to shift in the bed due to pain keeps her awake. (Id.)

Ms. Gonzalez testified as a vocational expert (VE). The ALJ asked her to assume a hypothetical person age forty-five at the time of onset with sixteen years of education and the same past work experience as Plaintiff. (Id. at 39.) This person could lift and carry ten pounds occasionally and frequently; stand and walk for two hours out of eight and sit for six; could occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps; could never climb ropes, ladders, or scaffolds; and should avoid concentrated exposure to extreme cold and heat, fumes, odors, dust, gases, and such hazards as unprotected heights and moving and dangerous machinery. (Id.) Her ability to push and pull with her legs was limited to no bilateral operation of foot controls. (Id.) The ALJ asked if this hypothetical person could return to Plaintiff's past relevant work. (Id.) The VE replied that she could

return to Plaintiff's job as Director of Services.  (Id.)  This job as performed by Plaintiff between 2004 and 2007 was sedentary[3] and skilled.  (Id.)

If the job required lifting between ten and twenty pounds, she could not perform the job as Plaintiff performed it but could as it is customarily performed in the national economy and as described in the *Dictionary of Occupational Titles* (DOT).  (Id. at 39-40.) In the DOT, the job is referred to as Manager of Food Service, DOT 187.167-106.  (Id. at 40.)

This person could also work as a call out operator and an information clerk.  (Id. at 41.)  Both were sedentary and unskilled and existed in significant numbers in the state and national economies.  (Id.)

If this hypothetical person could only walk less than one block at any one time, could not lift anything heavier than five pounds, could stand for no longer than seven minutes at one time, could sit for no longer than twenty-five minutes before having to change positions, and must rest with her feet elevated on an as-needed basis, the person could not perform Plaintiff's past relevant work or any other job.  (Id. at 41.)

The VE stated that her testimony was consistent with the DOT and *Selected Characteristics of Occupations*.  (Id.)

_____

[3]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing."  20 C.F.R. § 404.1567(a).

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process,[4] documents generated pursuant to her application, and records from various health care providers.

On a Disability Report – Adult form, Plaintiff listed her height as 5 feet 6 inches and her weight as 236 pounds.  (Id. at 125.)  She described her disabling impairments as systemic lupus, nerve damage to her feet, fibromyalgia, and a leaking heart valve.  (Id. at 126.)  These impairments make it hard and very painful for her to walk.  (Id.)  They first bothered her on May 25, 2009, and prevented her from working that same day.  (Id.)  The job she had held the longest was a director of operations for a restaurant.  (Id. at 127.)  This job she had held from October 1982 to February 2000.  (Id.)  It required that she walk, stand, and stoop each for a total of seven hours a day; and kneel, crouch, and write, type, or handle small objects for six hours.  (Id.)  The heaviest weight – frozen stock – she had had to lift and carry was thirty-nine pounds.  (Id. at 127-28.)  The heaviest weight she had had to frequently lift and carry was ten pounds.  (Id. at 128.)  For eight hours each day, she had supervised between fifty to one hundred people.  (Id.)  Her medications included Aleve, Benicar, Darvocet, Flexeril, Neurontin, Plaquenil, Tylenol, and Vicodin.  (Id. at 130.)  The Vicodin and Benicar were for pain and were prescribed by Manzoor A. Tariq, M.D.  (Id.)  The Darvocet (for pain), Flexeril (for fibromyalgia and lupus), Neurontin (for nerve

---

[4]Prior DIB applications were denied in September 2004 and in November 2005.  (Id. at 122.)

damage), and Plaquenil (for lupus) were prescribed by Sherry Shuman, M.D.  (Id.)  None had any side effects.  (Id.)

On a Work History Report, Plaintiff described her job as a restaurant supervisor as requiring that the heaviest weight she lift was ten pounds and the heaviest weight she frequently lift was less than that.  (Id. at 134.)  She supervised between one hundred and two hundred people.  (Id.)  The job required that she walk, stand, or climb between zero and ten hours, that she sit between zero and two hours, and that she kneel or crouch between zero and three hours.  (Id.)  She did not have to stoop or crawl.  (Id.)  She described her job at Best Buy, the last job she held, as requiring walking and standing between seven and one-half to eight hours a day.  (Id. at 136.)

Plaintiff also completed a Function Report.  (Id. at 141-48.)  Asked to describe what she did from when she awoke until she went to bed at night, she explained that, after she was able to stand, she tried to take care of her personal hygiene, went to the kitchen to take her medications, and let her dog out the back door.  (Id. at 141.)  These tasks took approximately three and one-half hours.  (Id.)  She then made phone calls to ask for help from her family and friends.  (Id.)  She tried to do laundry and to cook some lunch for herself and her dog.  (Id.)  She then had to take medication and rest.  (Id.)  Because of her impairments, she can no longer walk or bathe her dog, play ball with him, train him, or take him to the nearby dog park.  (Id. at 142.)  Personal grooming tasks are difficult, e.g., she cannot stand long enough to shampoo her hair and has to sit to put her clothes on.  (Id.)  Her meals usually consist of sandwiches.  (Id. at 143.)  She no longer does yard work.  (Id.)

When doing laundry, it is so hard for her to climb the stairs that she stays in the basement for hours.  (Id.)  She does not go outside on a daily basis.  (Id. at 144.)  Driving has become difficult because she has to use both feet.  (Id.)  Medication, medical bills, and house and utility bills have depleted her finances.  (Id. at 145.)  She used to garden, play golf and tennis, dance, work, and play with her niece and nephew.  (Id.)  She can no longer do any of these activities because of the pain in her feet and the resulting depression.  (Id.)  She leaves her house to go to the doctor, visit with her parents, and, sometimes, go to church. (Id.)  Her impairments adversely affect her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and concentrate.  (Id. at 146.)  She can walk less than a few feet before having to rest for at least thirty minutes.  (Id.)  She can pay attention for thirty minutes at most.  (Id.)  Because of her pain, she lacks the ability to concentrate and follow instructions, written or spoken.  (Id.)  Because of the pain, she does not handle stress or changes in routine well.  (Id. at 147.  She is constantly afraid of falling.  (Id.)  She has special shoes and a splint; she uses crutches and a cane.  (Id.)  All were prescribed by her doctors.  (Id.)

Plaintiff reported on a Missouri Supplemental Questionnaire that she could sit for approximately twenty minutes before having to stand.  (Id. at 149-51.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application.  (Id. at 155-61.)  There had been no change in her condition – for better or worse – since she completed the earlier report, nor was there any new condition, illness, or

injury.  (Id. at 155.)  There were also no changes in how her impairments affected her daily activities or her ability to care for personal needs.  (Id. at 159.)

Plaintiff had reportable annual earnings for the thirty years between 1980 and 2009, inclusive.  (Id. at 115.)  In 2004, her annual earnings were $7,494[5]; in 2005, 2006, and 2007, her earnings ranged from $33,352 (in 2006) to $29,961 (in 2007).  (Id.)  Her annual earnings in 2008 were $4,142 and in 2009 were $9,804.  (Id.)  She did not work between November 2007 and August 2008.  (Id. at 133.)

The medical records before the ALJ begin in June 2007 when Plaintiff saw Dr. Tariq for a cardiac follow-up appointment,[6] reporting that she was doing well "from a cardiac standpoint."  (Id. at 171.)  She had no chest pain or shortness of breath, but did have strep throat, an ear infection, and low back pain that radiated down her left leg.  (Id.)  Her diagnoses included angina pectoris, coronary artery disease, systemic lupus erythematosus, GERD, and a history of a recent upper respiratory infection.  (Id.)  Plaintiff was instructed to follow a low-fat, low-cholesterol diet.  (Id.)  Her weight was 242 pounds.  (Id.)  She was also instructed to continue taking her prescribed medication of Diovan, Plaquenil, Neurontin, Flexeril, and Ranitidine.  (Id.)  She was to return in four and one-half months. (Id.)

---

[5]All amounts have been rounded to the nearest dollar.

[6]There are no earlier records from Dr. Tariq in the administrative record.

Plaintiff returned to Dr. Tariq in January 2008. (Id. at 172-73.) She had no specific symptoms, but occasionally had dyspnea (shortness of breath[7]) on exertion, paroxysmal nocturnal dyspnea (PND), and orthopnea without any pedal edema. (Id. at 172.) Dr. Tariq recommended that she undergo an ECG to evaluate her left ventricle (LV) function and valvular lesion. (Id.) "Otherwise, she should exercise." (Id.)

On April 2, Plaintiff informed Dr. Shuman that her main problem was fibromyalgia and the resulting chronic pain. (Id. at 199.) She had a history of lupus erythematosus. (Id.) In the past month, she had had two migraines. (Id.) She was to graduate from college the following fall. (Id.) Her heart rate and rhythm were normal and without a murmur, rub, or gallop. (Id.) She was tender to touch over her anterior chest wall, paraspinal muscles around her neck, rhomboids, medial fat pads of her knees, and her trochanteric bursa. (Id.) Dr. Shuman's diagnoses were fibromyalgia, with which Plaintiff was "doing adequately well"; chronic rhinitis, for which she was given a prescription for a nasal spray; and hypertension, which was "adequately controlled." (Id.)

A few weeks later, Plaintiff was seen by Allen Mark Jacobs, D.P.M., for treatment of her plantar fasciitis and posterior tibial tendinitis in her right foot and ankle. (Id. at 201.) It was noted that she had been having physical therapy and wearing supportive footwear and supports in her shoes. (Id.) Plaintiff reported that she was "making reasonable progress," was less tender when standing, and had an increased ability to stand and walk without discomfort. (Id.) Dr. Jacobs noted that a magnetic resonance imaging (MRI) of her right

---

[7]See Stedman's Medical Dictionary, 535 (26th ed. 1995) (Stedman's).

ankle after Plaintiff injured it at work showed no fracture or dislocation.  (Id.)  On examination, Plaintiff's posterior tibial tendon was tender on palpation and she had a mild hyperpronation deformity when standing.  (Id.)  She could rise on her toes and had no restriction to passive motion of her right ankle, subtalar, or mid tarsal joint.  (Id.)  She had minimal tenderness to palpation of her plantar fascia.  (Id.)  Plaintiff was to continue with her physical therapy and with walking as she was able.  (Id.)  She was to return in several months.  (Id.)

Plaintiff returned in one month, produced similar results on examination as the month before, and was instructed to continue with her orthotics, wear proper shoes, and participate in physical therapy.  (Id. at 200.)

Plaintiff saw Dr. Tariq in January 7, 2009, for "a routine cardiac follow-up.  (Id. at 167-70, 174-75.)  She "ha[d] not had much in the way of chest pain."  (Id. at 174.)  She was coughing and had chest congestion and pain in her chest and back when she took a deep breath.  (Id.)  She did not have any fever, chills, nausea, vomiting, dizziness, syncope, or palpitations.  (Id.)  "From a cardiac standpoint, she seem[ed] to be doing pretty well."  (Id.)  Dr. Tariq's assessment was of stable angina pectoris, hypertension, systemic lupus erythematosus, GERD, upper respiratory infection, and fibromyalgia.  (Id.)  Her prescription for Diovan was changed to Benicar.  (Id.)  Additionally, she was prescribed Augmentin, Celebrex, Plaquenil, Neurontin, Flexeril, Ranitidine, and aspirin.  (Id. at 174-75.)  Lab tests revealed a low white blood cell count, but were otherwise normal.  (Id. at 167-68.)  An ECG indicated a normal LV systolic function, mild mitral regurgitation,

- 12 -

moderate tricuspid regurgitation, and an estimated pulmonary artery (PA) systolic pressure of 63 mm of Hg (millimeters of mercury).  (Id. at 169-70.)

Plaintiff consulted John Holtzman, D.P.M., on January 21 about her bilateral foot pain of eighteen months' duration.  (Id. at 184, 191-93.)  On examination, she had a positive Tinel's sign[8] bilaterally at the porta pedis area,[9] pain with palpation at that area, and plantar fascia.  (Id. at 191.)  X-rays revealed plantar heel spurs, but no fractures.  (Id.)  Dr. Holtzman noted that all Plaintiff's pain was within the porta pedis.  (Id.)  She was referred to another doctor for an electromyogram (EMG) and nerve conduction studies  (Id.)

Consequently, Plaintiff consulted Ravi Yadava, D.O., the next day for the EMG and studies.  (Id. at 177-81.)  Plaintiff reported to Dr. Yadava that her right foot had started bothering her in 2002.  (Id. at 179.)  She had had a work-related injury to her right ankle, but not to her foot.  (Id.)  She had a diagnosis of lupus and fibromyalgia.  (Id.)  The lupus was stable.  (Id.)  She did not have any low back pain or any radiating pain pattern.  (Id.)  In the past month, she had had an abnormal heartbeat, mild seizures, nosebleeds, stomach pain, ulcers, and a poor appetite.  (Id.)  On examination, she had "considerable hypertrophy of the tibial nerve at the tarsal tunnel bilaterally with a positive Tinel's bilaterally" and

---

[8]Tinel's sign is indicative of an irritated nerve, and "is positive when lightly banging . . . over the nerve elicits a sensation of tingling, or 'pins and needles,' in the distribution of the nerve."  Definition of Tinel's sign, http://www.medterms.com/script/main/art.asp?articlekey=16687 (last visited Feb. 4, 2013).

[9]The porta pedis is a canal that is formed by the abductor hallucis brevis (a small muscle on the inside of the foot).  It is in this region that nerve entrapment usually occurs.  Tarsal tunnel syndrome is a painful entrapment involving the posterior tibial nerve where it enters the porta pedis.  See Tarsal Tunnel Syndrome, http://sanluispodiatrygroup.com/?page=patient_education&category (last visited Feb. 4, 2013).

"irritation of the plantar fascia insertion particularly in the medial band bilaterally." (Id. at 180.)  The results of the examination and of the various studies led Dr. Yadava to a diagnosis of entrapment neuropathy of the tibial nerve at the level of the medial ankle bilaterally, or tarsal tunnel syndrome.[10] (Id.)  The neuropathy was mild.  (Id.)  There was no motor involvement, axonal loss, or acute denervation.  (Id. at 181.)

Plaintiff reviewed Dr. Yadava's report with Dr. Holtzman on January 28 and was given a bilateral cortisone injection in her porta pedis.  (Id. at 184, 190.)

Plaintiff reported to Dr. Holtzman when she saw him on February 18 that the injections had given her 30 percent relief.  (Id. at 184, 189.) She was again given injections. (Id.)  The following month, Plaintiff informed Dr. Holtzman that she was continuing to experience pain in her feet.  (Id. at 184, 188.)  Although the last injections had helped, the pain would return when she was on her feet for more than four hours.  (Id. at 188.) Injections were again administered.  (Id.)  Plaintiff was to be off work for two days to "help calm down [the] area."  (Id.)

On April 1, Plaintiff reported to Dr. Holtzman that her right foot was more painful than her left and that she would "do[ ] well until she [got] 4000 steps on her pedometer." (Id. at 184, 187.)  The option of surgery was discussed.  (Id. at 187.)  Plaintiff elected to have another round of injections.  (Id.)  When Plaintiff saw Dr. Holtzman the following month, she told him that the relief from the injections lasted only for a few hours.  (Id. at

---

[10]See note 9, supra.

184, 186.)  She was given a prescription for Cymbalta and instructed to call immediately if there were any side effects.  (Id. at 186.)  She was to return in four weeks.  (Id.)

Plaintiff saw Dr. Shuman in June, informing her that she had had pain in her left wrist for two months and, consequently, could not open doors or use a wash cloth.  (Id. at 197-98, 242-43.)  She also had pain in her right foot.  (Id. at 197.)  She reported that the injections had helped for a few days; however, she now had "really bad pain" in that foot at night and when she stood on it.  (Id.)  The gabapentin she had been taking helped her "overall pain," but not her right foot pain.  (Id.)  Her fibromyalgia had been bothering her. (Id.)  On examination, Plaintiff's left wrist was tender, but was not swollen and had a full range of motion.  (Id. at 198.)  Her feet appeared normal.  (Id.)  She had soft tissue discomfort in her posterior shoulders, chest, upper right buttock, right and left lateral epicondyle, left flank, abdomen, left trochanteric bursa, and both knees.  (Id.)  Out of eighteen possible trigger points, she had eleven.  (Id.)  Dr. Shuman's diagnosis was of chronic myalgia and myositis.  (Id.)

Plaintiff returned to Dr. Holtzman on September 15, explaining that she could not have the surgery because she had to work and take care of her house and informing him that her feet still hurt and the pain was, at worse, a ten.  (Id. at 183, 185.)  He sent her for some orthotics for support for her plantar fasciitis and gave her bilateral injections.  (Id. at 185.)  She was to return as needed.  (Id.)

The following day, Plaintiff saw Dr. Shuman for treatment of a cough of three weeks' duration that was unrelieved by Robitussin.  (Id. at 195-96, 240-41.)  "Her feet hurt too

- 15 -

badly to work." (Id. at 195.) She reported that she had had at least five injections, but they had provided only temporary relief. (Id.) Surgery had been suggested, but she could not afford it. (Id.) Tarsal tunnel syndrome was added to her previous diagnoses of myalgia and myositis (inflammation of a muscle[11]) and migraines. (Id.)

Plaintiff saw Dr. Shuman again on December 15, reporting that she felt miserable, was tired, was sore, and had a chronic cough. (Id. at 237-39.) Also, her feet were "very sore," and she was "unable to stand for very brief periods of time" before having to sit down. (Id. at 237.) Because of the pain, she could not work. (Id.) On examination, she had a full range of motion in her shoulders, elbows, and knees. (Id. at 238.) Her extremities appeared normal. (Id.) She was tender over the medial aspect of her ankles. (Id.) Her diagnoses were unchanged. (Id. at 237.) Her medications included Flexeril, Benicar, gabapentin, Protonix, and Maxalt. (Id.) She was referred back to podiatry for treatment. (Id. at 238.)

Plaintiff again saw Dr. Tariq on February 1, 2010, reporting that she had been having chest pain for the past two months, with approximately four incidents each week and primarily at night. (Id. at 219-20.) Some shortness of breath accompanied the pain. (Id. at 219.) She was not dieting or exercising, and was encouraged to do both. (Id.) An EKG revealed a normal sinus rhythm and left atriel abnormality. (Id.) She was to continue taking her home medications, including Benicar, Plaquenil, Neurontin, Flexeril, Mobic, AcipHex, Cymbalta, Metoprolol, and aspirin; she was to have an ECG. (Id. at 219-20.) She was also

---

[11]See Stedman's at 1170.

to have lab work done that day.  (Id. at 220.)  The next day, an ECG was performed to evaluate her LV function and valvular lesion.  (Id. at 226.)  The LV systolic function was "near normal."  (Id.)  The ECG also revealed concentric LV hypertrophy, mild mitral regurgitation, mild tricuspid regurgitation, and an estimated PA systolic pressure of 48 mm of Hg.  (Id.)

A few weeks later, Plaintiff returned to Dr. Shuman.  (Id. at 234-36.)  She reported that "[h]er whole body hurt[]."  (Id. at 234.)  She was short of breath and was still coughing.  (Id.)  Her hips, arms, and ribs were sore.  (Id.)  On examination, she was in no apparent distress and had no skeletal tenderness or deformity.  (Id. at 235.)  Her migraines were described as "stable."  (Id.)  Propoxacet (propoxyphene and acetaminophen[12]) was added to her prescriptions, to be taken as needed.  (Id. at 234.)  Lyrica was  prescribed instead of the gabapentin for her myalgia and myositis.  (Id. at 235.)

Plaintiff informed Dr. Tariq when she next saw him, on March 8, that she had had no episodes of chest pain, but had had some shortness of breath and wheezing since the previous November.  (Id. at 217-18.)  She also had had a left earache since the day before.  (Id. at 217.)  Dr. Tariq noted that Plaintiff had not had the lab work done, nor was she dieting or exercising.  (Id.)  She was encouraged to follow a low-fat diet and exercise, was given a prescription for Spiriva and an inhaler, had a previous prescription for Percocet

---

[12]See Propoxacet-N, http://www.drugs.com/cons/propoxacet-n.html (last visited Feb. 4, 2013).

- 17 -

(oxycodone and acetaminophen[13]) changed to Percodan (oxycodone and aspirin[14]), and was to continue with her other medications.  (Id.)

Shortly thereafter, Plaintiff underwent a sleep study to investigate the cause of her excessive daytime sleepiness.  (Id. at 221-25.)  It was concluded she did not have sleep apnea.  (Id. at 221.)  She had 75.7 percent sleep efficiency; normal sleep efficiency is greater than 80 percent.  (Id.)  Dr. Tariq recommended that she lose weight and cautioned her about factors that might exacerbate snoring and sleep-related problems, e.g., taking central nervous system depressants at bedtime,  and about driving until the problem was resolved.  (Id.)

In April, Plaintiff saw Dr. Shuman again.  (Id. at 231-33.)  She was gaining weight[15] on the Lyrica and wished to resume taking the gabapentin.  (Id. at 231.)  She continued to have a chronic cough, which was worse when she came in from the cold.  (Id.)  She had thirteen trigger points.  (Id. at 232.)  The gabapentin was resumed.  (Id.)

Two months later, in June, Dr. Shuman completed a "Physician's Assessment for Social Security Disability Claim" form on behalf of Plaintiff.  (Id. at 230.)  Asked to list current diagnoses, recommended treatment, and restrictions, she replied that the diagnosis was fibromyalgia and restrictions were "per patient tolerance."  (Id.)  Asked if Plaintiff's endurance was affected by her impairments, Dr. Shuman replied in the affirmative and

---

[13]See Physicians' Desk Reference, 1096 (65th ed. 2011) (PDR).

[14]See PDR at 1099.

[15]Plaintiff's weight is not listed; however, it is noted that she had not gained or loss weight.

- 18 -

responded that Plaintiff frequently needed "to rest during the day to tolerance." (Id.) Asked if Plaintiff was able, with her combination of impairments, to sustain competitive employment at the sedentary level,[16] Dr. Shuman answered simply, "No." (Id.) She did not, as the form requested, state the reasons for her answer.  (Id.)

Also before the ALJ was the results of a November 2009 Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff completed by Donna Muckerman-McCall, D.O.  (Id. at 206-11.)  The primary diagnosis was tarsal tunnel syndrome; the secondary diagnosis was fibromyalgia; other alleged impairments were angina, hypertension, hyperlipids, and obesity.  (Id. at 206.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally and frequently lift or carry ten pounds,; stand or walk for at least two hours in an eight-hour workday; and sit about six hours in an eight-hour day.  (Id. at 207.)  She could not operate equipment or controls with her feet.  (Id.)  She had no postural, manipulative, visual, or communicative limitations.  (Id. at 207-09.)  She had environmental limitations of needing to avoid concentrated exposure to extreme cold and heat; to such pollutants as fumes, odors, dusts, and gases and to poor ventilation; and to hazards, e.g., machinery and heights.  (Id. at 209.)

### The ALJ's Decision

Analyzing Plaintiff's application under the Commissioner's five-step evaluation process, the ALJ first noted that Plaintiff met the insured status requirements of the Act

---

[16]The form included the definition of sedentary work as generally defined in the regulations. See note 3, supra.

through September 30, 2013, and had not engaged in substantial gainful activity since her alleged disability onset date of May 25, 2009.  (Id. at 11.)  Next, the ALJ found that Plaintiff had severe impairments of fibromyalgia versus myalgia and myositis, history of lupus, bilateral mild tarsal tunnel syndrome, plantar fasciitis, and obesity.  (Id.)  Her GERD, mild mitral and tricuspid regurgitation, and headaches were not severe.  (Id. at 15.)  After summarizing Plaintiff's medical records, the ALJ concluded that she did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity. (Id. at 12.)  She did have the residual functional capacity (RFC) to perform sedentary work except she was limited to lifting and carrying ten pounds, standing or walking for no longer than two hours out of eight, and sitting for no longer than six hours. She was also (1) limited to only occasionally balancing, stooping, kneeling, crouching, crawling, and climbing stairs and ramps, and (2) precluded from (a) climbing ropes, ladders, and scaffolds, (b) operating foot controls, and (c) exposure to fumes, odors, dusts, gasses, extreme heat and cold, and hazards of unprotected heights and moving and dangerous machinery.  (Id.)

When assessing Plaintiff's RFC, the ALJ evaluated her credibility.  (Id. at 13-15.) He concluded that she had exaggerated her symptoms and complaints.  (Id. at 14.)  For instance, there was no support in the record for her testimony that a doctor had told her to elevate her legs continually.  (Id.)  Instead, the medical records consistently noted the lack of any swelling or edema.  (Id.)  The record also did not support Plaintiff's description of such limitations that she had to have meals brought to her and took three and one-half hours

to dress.  (Id.)  She declined surgery for her foot pain.  (Id.)  Although she claimed she could not afford it, studies had shown her foot condition to be only mild and there was no evidence she had ever been denied treatment due to an inability to pay.  (Id.)  Indeed, she had received treatment from Drs. Holtzman, Shuman, and Tariq without any reference to her inability to pay for their services.  (Id.)  Also, Plaintiff had filed for unemployment benefits, representing that she was actively searching for work.  (Id.)

Addressing Dr. Shuman's opinion that Plaintiff must rest during the day, the ALJ remarked that there was no support for that opinion in Dr. Shuman's treatment notes.  (Id.)  Moreover, the opinion was "obviously based on what [Plaintiff] told Dr. Shuman, rather than on any objective diagnostic basis." (Id.)  The ALJ found it significant that Dr. Shuman did *not* opine that Plaintiff was disabled.  (Id.)  Dr. Shuman had also not provided any factual support for her conclusion that Plaintiff could not perform sedentary work or any definition of what she considered sedentary work to be.  (Id.)  The ALJ considered whether it was necessary to recontact Dr. Shuman and concluded that it was not.  (Id. at 15.)

With her RFC, Plaintiff could perform her past relevant work as manager of food service as it is actually and generally performed.  (Id.)  This conclusion is supported by the VE's testimony.  (Id.)

For the foregoing reasons, Plaintiff was not disabled within the meaning of the Act. (Id. at 16.)

**Legal Standards**

Under the Act, the Commissioner shall find a person disabled "if [s]he is unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(a)(4)(i).  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(a)(4)(ii).  A severe  impairment is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. § 404.1520(c).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments

listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(a)(4)(iii) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"  **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)).  "'[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'"  **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting

Moore, 572 F.3d at 524).  "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'"  **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)).  Moreover, an ALJ is not required to methodically discuss each of the relevant credibility factors, "'so long as he acknowledge[s] and examine[s] those considerations before discounting a claimant's subjective complaints.'"  **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011)).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(a)(4)(iv).  Additionally, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as she actually performed it or as generally required by employers in the national economy."  **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007).  The burden at step four remains with the claimant.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national

- 24 -

economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

   If the claimant is prevented by her impairment from doing any other work, the ALJ is to find the claimant to be disabled.

   The ALJ's decision – adopted by the Commissioner when the Appeals Council denied review – whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Perkins v. Astrue**, 648 F.3d 892, 897 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009)).  When reviewing the record, however, the Court "'must consider evidence that both supports and detracts from the ALJ's decision, but [may not] reverse an administration decision simply because some evidence may support the opposite conclusion.'"  **Id.** (quoting Medhaug, 578 F.3d at 813).  "'If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'"  **Id.** (quoting Medhaug, 578 F.3d at 897).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred (1) by failing to give controlling weight to the opinion of Dr. Shuman that she needs to rest during the day and is unable to sustain competitive employment at the sedentary level, and (2) by finding that she could return to her past relevant work in the restaurant industry.

Dr. Shuman's Opinion.  As noted above, Dr. Shuman reported that Plaintiff had fibromyalgia and restrictions "per [Plaintiff's] tolerance."  (R. at 230.)  Also, Plaintiff would need to rest during the day and could not perform sedentary work.  (Id.)  Plaintiff contends that this opinion by Plaintiff's treating physician, a specialist, is supported by Dr. Shuman's treatment notes and her longitudinal perspective of Plaintiff's impairments.   The Commissioner disagrees.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009).   "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted); accord **Martise v. Astrue**, 641 F.3d 909, 925 (8th Cir. 2011).  Thus, "'an ALJ may credit other medical evaluations over that of the treating physician when such assessments are

- 26 -

supported by better or more thorough medical evidence.'" **Id.** (quoting Brown v. Astrue, 611 F.3d 909, 951 (8th Cir. 2011)).  And, "'[w]hen deciding how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations.'" **Id.** (quoting Brown, 611 F.3d at 951).  See also 20 C.F.R. § 404.1527(c) (listing six factors to be evaluated when weighing opinions of treating physicians, including supportability and consistency).

In the instant case, the record includes notes of six visits to Dr. Shuman between April 2008 and April 2010, inclusive.  The first visit – thirteen months before Plaintiff's alleged disability onset date – was for treatment of Plaintiff's fibromyalgia and chronic pain.  At her first visit to Dr. Shuman after her alleged disability onset date, Plaintiff complained of pain in her right foot.  Her feet, however, appeared normal.  The next visit to Dr. Shuman was three months later and was for complaints of a cough.  Plaintiff reported at this visit that she could not work because of pain in her feet.  Three months later, she again saw Dr. Shuman and again reported that she could not work.  Dr. Shuman noted that Plaintiff's extremities appeared normal.  Two months later, Plaintiff reported that her entire body hurt.  The next, and last visit to Dr. Shuman, Plaintiff described being as "tender as mother's love."  (R. at 232.)  Thus, the earliest record of Dr. Shuman's is dated thirteen months before Plaintiff's alleged onset date, is for treatment of the same condition – fibromyalgia – that Dr. Shuman later lists as the disabling impairment, and notes Plaintiff's complaint of foot pain.  Later records consistently refer to Plaintiff's own report of how her pain precludes employment.  Clearly, Dr. Shuman's conclusory opinion about Plaintiff's need to rest and capacity for

sedentary work rendered two months after she last saw Plaintiff was based on Plaintiff's reports of disabling pain,[17] as is evident from her reference to unidentified restrictions being dictated by Plaintiff's tolerance.

"It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," **Davidson**, 578 F.3d at 843, or consists of conclusory statements, **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). See **Renstrom**, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-controlling weight when that opinion was largely based on claimant's subjective complaints and was inconsistent with other medical experts); **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (rejecting claimant's challenge to lack of weight given treating physician's evaluation of claimant's mental impairments when "evaluation appeared to be based, at least in part, on [claimant's] self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, [the treating physician's] report was rendered less credible"); **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence); **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a

---

[17]The Court notes that Plaintiff does not challenge the ALJ's assessment of her credibility. Regardless, any such challenge would be unavailing for the reasons advanced by the Commissioner. (See Def. Br. at 5-7, ECF No. 24.)

treating physician's opinion is limited if the opinion consists only of conclusory statements.").

The lack of support in her own treatment notes for her conclusion that Plaintiff cannot perform sedentary work is underscored by Dr. Shuman's failure to provide, as requested, reasons for her conclusion. In **Perks v. Astrue**, 687 F.3d 1086, 1092 (8th Cir. 2012), the Eighth Circuit Court of Appeals noted that it has "previously held that '[p]hysician opinions that are internally inconsistent . . . are entitled to less deference than they would receive in the absence of inconsistencies.'" (Quoting Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)) (alterations in original).

For the foregoing reasons, the ALJ did not err in not giving Dr. Shuman's December 2010 opinion greater weight.

Plaintiff further argues, however, that the ALJ should have recontacted Dr. Shuman for further information. This argument is unavailing for two reasons. First, it is premised on a misreading of the ALJ's opinion. The ALJ did not state that additional information was needed from Dr. Shuman; indeed, he stated the opposite. Second, a critical issue was not developed; rather, it was developed and found to be adverse to Plaintiff's disability claims. See **Martise**, 641 F.3d at 926-27 (holding that "lack of medical evidence *to support a doctor's opinion* does not equate to underdevelopment of the record as to a claimant's disability, as the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians" and that "[w]hile [a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped, the

- 29 -

ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled") (internal quotations omitted) (all but second alteration in original).

Past Relevant Work.  Plaintiff next argues that the ALJ erred by finding she could return to her past relevant work as the DOT definition of that work requires a higher exertional level than the sedentary level the ALJ included in his RFC.

As noted by Plaintiff, the DOT classification cited by the VE – manager of food service – has a strength requirement of light work.[18]  See DOT, 187.167-106, 1991 WL 671389 (4th ed. rev. 1991).  The physical demands of light work are in excess of those required for sedentary work.  Id.  See also 20 C.F.R. § 404.1567(b).  As noted by the Commissioner, however, "'DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.'" **Page v. Astrue**, 484 F.3d 1040, 1045 (8th Cir. 2007) (quoting Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000)).  "'The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities.'" **Moore v. Astrue**, 623 F.3d 599, 604 (8th Cir. 2010) (quoting Wheeler, 224 F.3d at 897).  "'In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT.'" **Id.** (quoting Wheeler, 224 F.3d at 897).

In response to the ALJ's hypothetical question, the VE replied that Plaintiff could perform the work of a manager of food service as she performed it or, depending on the

---

[18]The Court notes that the VE cited two other jobs Plaintiff could perform, both sedentary.

lifting requirements, as described in the DOT.  "Although the DOT generally controls, '[t]he DOT classifications may be rebutted . . . with VE testimony which shows that particular jobs, whether classified as light or sedentary, may be ones that a claimant can perform.'" **Young v. Apfel**, 221 F.3d 1065, 1070 (8th Cir. 2000) (quoting Montgomery v. Chater, 69 F.3d 273, 276 (8th Cir. 1995) (alterations in original).  In **Young**, the court rejected an argument that there was a fatal contradiction between the claimant's capacity for sedentary work and the VE's citation to jobs classified by the DOT as light.  **Id.**  The court found that the VE's testimony that some of the positions as they existed could be performed at the sedentary level sufficient to support the ALJ's decision.[19]  **Id.**

In the instant case, the VE further testified that her responses were consistent with the DOT.  Social Security Ruling 00-4p requires that occupational evidence given by a VE generally be consistent with the occupational information of the DOT.  See Social Security Ruling 00-4p, 2000 WL 1898704 at *2.  "At the hearings level, as part of the [ALJ's] duty to fully develop the record, the [ALJ] will inquire, on the record, as to whether or not here is such consistency."  Id.  The VE's testimony that there were significant numbers of jobs as managers of food service that could be performed by a claimant restricted to work at the sedentary level sufficiently supports the ALJ's finding that Plaintiff could return to her past relevant work as that work is actually and generally performed.

---

[19]The court also held that regardless of whether the VE successfully rebutted the DOT definitions, the ALJ had sufficiently identified other unskilled jobs.  221 F.3d at 1070.

**Conclusion**

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently."  **Wildman**, 596 F.3d at 964.  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.




/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  8th  day of February, 2013.